UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JOSEPH COLLICK, | : | CIVIL ACTION NO. 08-5120 (MLC) |
|  | : |  |
| Plaintiff, | : | **MEMORANDUM OPINION** |
|  | : | **FILED: OCTOBER 28, 2009** |
| v. | : |  |
|  | : |  |
| WEEKS MARINE, INC., et al., | : |  |
|  | : |  |
| Defendants. | : |  |

**COOPER, District Judge**

**APPEARANCES**

Bennett, Giuliano, McDonnell & Perrone, LLP (Nicholas P. Giuliano, Matthew J. Cowan, and Richard J. Colosimo, of counsel), Morris Plains, New Jersey, for Plaintiff.

Betancourt, Van Hemmen, Greco & Kenyon LLC (Ronald Betancourt, of counsel), Red Bank, New Jersey, for Defendant Weeks Marine, Inc.

Plaintiff, Joseph Collick, brought this action against his former employer, defendant Weeks Marine, Inc. ("Weeks"), and defendant Haztek, Inc., to recover damages for personal injuries. (Dkt. entry no. 24, Am. Compl.)  Plaintiff now moves, pursuant to Federal Rule of Civil Procedure ("Rule") 65, to preliminarily enjoin Weeks from failing to pay him "maintenance and cure" under general maritime law.  (Dkt. entry no. 45, Mot. for Order to Show Cause.)  Weeks opposes the motion.  (Dkt. entry no. 54, Weeks Br.)

The Court has considered the papers submitted by the parties and heard oral argument on October 7, 2009.  No party requested an evidentiary hearing.  The Court hereby issues its preliminary

findings of fact and conclusions of law as required by Rule
52(a)(2).  The Court, for the reasons stated herein, will grant
the motion for a preliminary injunction.

**BACKGROUND - FACTUAL FINDINGS**

**I.   The Accident**

Plaintiff is a marine construction worker.  He began working
for Weeks in the construction of a pier at the Earle Naval
Weapons Station in March 2006.  (Dkt. entry no. 47, Pl.'s Decl.
at ¶ 3.)  He was typically assigned to a particular crane barge,
Barge 572, as a dockbuilder.  (Dkt. entry no. 54, Declaration of
Daniel Mowers ("Mowers Decl."), Exs. 1 & 2.)

On November 17, 2006, the Weeks employees on Barge 572 were
using the crane to position a heavy piece of pre-cast concrete
onto the pier.  (Pl.'s Decl. at ¶ 4.)  The concrete got hung up
on a piece of "candy cane" rebar protruding from another piece of
concrete.  (Id.)  Plaintiff's supervisors directed him to stand
on a five-inch-wide section of concrete suspended from the crane
and use a tool to bend the rebar out of the way.  (Id.)  The tool
slipped off the rebar, and Plaintiff fell twelve to fifteen feet
to the deck of the pier.  (Id.)  In the fall, he suffered a
"pilon fracture dislocation of [his] right ankle."  (Id.; see id.
at Ex. 4, 10-7-08 Report of Dr. Austin Fragomen.)

## II.  Weeks's Initiation and Suspension of Payment of Benefits to Plaintiff

Immediately after Plaintiff's injury, Weeks began voluntarily paying him medical and wage benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950 ("LHWCA").  Plaintiff filed a claim to recover compensation benefits from Weeks with the United States Department of Labor ("DOL"), Office of Workers' Compensation Programs ("OWCP"), and listed his occupation as dockbuilder.  (Dkt. entry no. 18, Decl. of Thomas Langan ("Langan Decl.") at ¶ 6; id., Ex. B, Employee's Claim for Compensation Form.)  Plaintiff then brought this action on October 17, 2008, stating that he was a seaman and asserting claims, inter alia, under general maritime law and the Jones Act, 46 U.S.C. § 30104.  (Am. Compl. at 6-12; dkt. entry no. 1, Compl.)  Weeks discontinued paying LHWCA benefits to Plaintiff shortly after he brought this action, based on a question of whether Plaintiff was a seaman, which would preclude him from coverage under the LHWCA.  (Pl.'s Decl., Ex. 2, Notice of Controversion of Right to Compensation and Notice of Final Payment of Suspension of Compensation Payments (showing that Weeks made weekly payments of $996.50 from 11-18-06 through 10-20-08); Langan Decl. at ¶ 10.)

Plaintiff has filed an administrative claim with the OWCP for payments under the LHWCA.  (See dkt. entry no. 28, 4-20-09 Mem. Op. at 3-6 (discussing administrative scheme for LHWCA

3

claims).)  Plaintiff's counsel indicated at oral argument that
the parties participated in an informal conference regarding the
LHWCA claim before the DOL, but Weeks has refused to implement
the DOL's recommendations, and Plaintiff has not yet sought an
ultimate determination of his eligibility for LHWCA benefits from
an administrative law judge.  (Pl.'s Decl., Ex. 6, 2-3-09
Memorandum of Informal Conference.)  Thus, although Plaintiff's
LHWCA claim remains pending, it is "on hold" while Plaintiff
pursues a determination in this Court as to whether he is a Jones
Act seaman.

Plaintiff contends that Weeks's refusal to pay either LHWCA
benefits, or maintenance and cure benefits under general maritime
law, since October 20, 2008, has resulted in impending financial
ruin.  To avoid losing his home, he borrowed $15,000 from his
annuity in March 2008, costing him $3,630 in fees, penalties, and
taxes.  (Pl.'s Decl. at ¶ 6.)  Plaintiff also took a job on or
about May 13, 2009, as a cabinet maker, where he makes $13.00 per
hour and works approximately 25 hours per week.  (Id.)  Plaintiff
estimates his household expenses at $93.34 per day, and seeks
maintenance in that amount.  (Pl.'s Decl. at ¶ 8.)  He does not
earn enough at his cabinet making job to pay his monthly bills,
and he has fallen behind on his mortgage, electric, and gas
bills.  (Dkt. entry no. 56, Pl.'s Reply Decl. at ¶ 3.)  As of
September 25, 2009, Plaintiff had $500 in his bank account and a

mortgage payment of $1,600 due.  (Dkt. entry no. 57, Pl.'s Reply Br. at 7 n.3.)

### III. Plaintiff's Prognosis

Plaintiff has had five ankle surgeries, and will require additional surgical procedures in the future.  (Pl.'s Decl. at ¶ 4.)  Every doctor who has treated him has opined that he cannot return to construction work.  (Id.; see, e.g., Langan Decl., Ex. I, 2-19-07 Report of Dr. Ian Fries ("[A] return to heavy construction work as a dockbuilder is not a reasonable goal for Mr. Collick.  I advise prompt referral for vocational rehabilitation."); Langan Decl., Ex. M, 1-16-08 Report of Dr. Matthew Roberts ("[Joseph Collick's injury] is a permanent condition and will likely require him to seek other employment as he will be disabled as a construction worker.").)  Plaintiff suffers constant pain in his right leg, as well as in his left leg and back because he cannot walk properly.  (Pl.'s Decl. at ¶ 7.)  A broken screw in his leg frequently "catches," causing him pain, and needs to be removed.  (Id.)  Since Weeks stopped paying him benefits and covering his medical expenses, Plaintiff has received no medical treatment, because he has no insurance and cannot pay for treatment himself.  (Pl.'s Reply Decl. at ¶ 3.)

The parties disagree as to the proper course of treatment for Plaintiff's injuries.  Plaintiff contends that his treating physician, Dr. Austin Fragomen, recommended "distraction

5

arthroplasty."  (Pl.'s Decl. at ¶ 7; <u>see</u> 10-7-08 Report of Dr.
Austin Fragomen (recommending same, advising that Plaintiff
understood the procedure had a 75% success rate, and noting that
regeneration of cartilage in the ankle could occur).)[1]  Plaintiff
explains that he prefers to undergo distraction arthroplasty
because his physicians have advised that he is too young to
undergo the alternative treatments of an ankle fusion or total
ankle replacement surgery.  (Pl.'s Decl. at ¶ 7.)  Also, part of
the procedure recommended by Fragomen involves the "inject[ion
of] bone marrow aspirate to help regenerate the cartilage."  (10-
7-08 Report of Dr. Austin Fragomen.)

    Dr. Ian Fries, who examined Plaintiff at Weeks's request on
one occasion, advised Weeks's corporate claims manager, in
contrast, that distraction arthroplasty is a novel technique with
unpredictable results.  (Langan Decl., Ex. I, 2-19-07 Report of
Dr. Ian Fries at 1; <u>id.</u>, Ex. L, 11-20-08 Report of Dr. Ian Fries
at 2.)  Fries further opined that "ankle arthrodesis"[2] or total

---

    [1] "Distraction" refers to "a force applied to a body part to
separate bony fragments or joint surfaces."  <u>Stedman's Medical
Dictionary</u> 117340 (27th ed. 2000).  "Arthroplasty" can refer to:
"1.  Creation of an artificial joint to correct advanced
degenerative arthritis, 2. An operation to restore as far as
possible the integrity and functional power of a joint."  <u>Id.</u> at
33400.

    [2] "The stiffening of a joint by operative means."  <u>Stedman's
Medical Dictionary</u> 33160 (27th ed. 2000).

ankle replacement are more commonly accepted treatment options. (Id., Ex. L, 11-20-08 Report of Dr. Ian Fries at 2.)

Weeks has offered to pay maintenance and cure benefits to Plaintiff, "without prejudice," on the condition that he agrees to undergo the course of treatment recommended by Fries. (Langan Decl. at ¶ 14; id., Ex. N, 12-4-08 Letter from Weeks's Counsel to Plaintiff's Counsel.) Plaintiff did not respond to Weeks's offer. (Id. at ¶ 15.) Plaintiff contends, and Weeks does not dispute, that Weeks initially authorized him to consult with Fragomen, even though Weeks knew Plaintiff was consulting him about distraction arthroplasty. The surgery was scheduled, but when Plaintiff brought this action, ten days after his consultation with Fragomen, Weeks refused to authorize the procedure. (Pl.'s Decl. at ¶ 7; id., Ex. 5, 9-30-08 Letter from Teresa Olivo to Dr. Austin Fragomen; 10-7-08 Report of Dr. Austin Fragomen.) Plaintiff has not seen a doctor about his injuries since seeing Fragomen on or about October 7, 2008. (Pl.'s Decl. at ¶ 7.)

An informal conference with the DOL in Plaintiff's proceedings for LHWCA benefits in the OWCP resulted in a recommendation by the DOL's claims examiner that Weeks should "authorize the claimant's choice of physician, including any recommended tests an[d] surgery." (Pl.'s Decl., Ex. 6, 2-3-09 Memorandum of Informal Conference.)

7

## IV.  **Nature of Plaintiff's Work at the Time of the Accident**

The pier at the Earle Naval Weapons Station extends about two miles into the Sandy Hook Bay off the shore of New Jersey. (Pl.'s Decl. at ¶ 2.)  The pier is shaped like a trident and is large enough to serve U.S. Navy vessels.  (Id.)  Plaintiff was employed by Weeks to work on the construction of the pier from early March 2006 until his accident on November 17, 2006.  (Id. at ¶¶ 2-3.)  In the month preceding Plaintiff's accident,[3] Weeks assigned Plaintiff, along with four other dockbuilders and a crane operator, to work on Barge 572, a crane barge located adjacent to the center prong of the three-pronged pier.  (Id. at ¶ 4; Mowers Decl., Exs. 1 & 2; Pl.'s Reply Br. at 5.)[4]  On a typical work day in the fall of 2006, approximately forty dockbuilders worked on constructing the pier.  (Mowers Decl. at ¶ 4.)

---

[3] Plaintiff avers generally that Weeks assigned him to work on a crane barge, but does not indicate whether he consistently worked on the same crane barge from the inception of his employment in March 2006.  (Pl.'s Decl. at ¶ 4.)  Because Weeks provided specific time sheets showing Plaintiff's particular assignments from October 9, 2006, until the date of the accident, the Court makes preliminary findings of fact as to that time frame only.

[4] Although Thomas Langan, Corporate Risk Manager for Weeks, contends in his Declaration that "Plaintiff was not a member of the crew of the crane barge or otherwise assigned to it by Weeks," the Contractor Production Reports and Daily Time Sheets submitted in support of the Mower Declaration clearly belie this assertion.  (Langan Decl. at ¶ 4.)

The work of the six employees assigned to Barge 572, as reflected by Weeks's daily time sheets, included installing bollards; erecting loading ramps and platforms; forming and stripping bollards and platform columns; erecting rail blockouts; erecting a utility gallery; pouring cement for bollard and platform columns; forming and stripping cap joints; forming, pouring, and stripping concrete plugs; forming and stripping joints; pouring cement for pile plugs; erecting pier crane rail beams; erecting platform beams; erecting box beams; preparing deck forms; pouring cement for cap joints; pouring cement for column cap walls; pouring cement for the pier deck; and erecting a pier crane beam.  (Mower Decl. at ¶ 6; id., Ex. 2, Daily Time Sheets.)  On the day of Plaintiff's accident, Barge 572 and the employees working on it were engaged in erecting a loading platform.  (Id., Ex. 2, 11-17-06 Daily Time Sheet.)

Plaintiff also asserts that the barge crew "had to pay attention to whether the barge was taking on water, needed pumping, or was listing."  (Pl.'s Decl. at ¶ 3.)  Daniel Mowers, Construction Superintendent for Weeks, states that only he and the crane barge operator were responsible for monitoring Weeks's barges, not the dockbuilders.  (Mowers Decl. at ¶ 10.)  Plaintiff denies this assertion, pointing out that the dockbuilders' own safety depended on the seaworthiness of Barge 572.  (Pl.'s Reply Decl. at ¶ 2.)

Barge 572 was typically "spudded down" to the ocean floor. (Mowers Decl. at ¶ 11.)  Despite Barge 572's default stationary position, the time sheets show that the dockbuilders assisted in moving Barge 572 approximately three to four times per week. (Mower Decl., Ex. 1.)  This evidence contravenes Mowers's assertion that the dockbuilders only assisted tugboat crews in moving the barges "about once a week."  (Mowers Decl. at ¶ 9.) Mowers insists that "[o]nly a hand-full [sic] of the dockbuilders of the forty or so working would be needed" to assist in moving the barges, but the time sheets indicate that Barge 572 had a crew of just six workers.  (Id.)  Thus, Plaintiff's contention that he assisted in moving the barge on recurring occasions, as frequently as several times a week, is supported by the record before the Court.  See Elliott v. Kiesewetter, 98 F.3d 47, 54 (3d Cir. 1996) (affirming district court's grant of preliminary injunction without holding an evidentiary hearing despite purported existence of factual dispute, because "facts in the record . . . indicate[d] that there [was] a strong likelihood" that factual issue would be resolved against the enjoined party).

Plaintiff estimates that he was physically located on Barge 572 about 75% of the time he was at work.  (Pl.'s Decl. at ¶ 3.) He reported to work, and changed into his work clothes in a shanty, on Barge 572.  (Id.)  He ate his lunch, took his breaks, and stored his tools on Barge 572.  (Id.)  Plaintiff drove piles

from, cut piles from, prepared work on, and repaired the pile driving hammer on Barge 572, and assisted in moving it by handling lines from tugboats used to move the barge.  (Id.) These contentions are supported by the Contractor Production Reports and Daily Time Sheets describing the work performed at the construction site and by the employees assigned to Barge 572 in particular.

Superintendent Mowers contends that Plaintiff's work occurred "almost exclusively on the pier" rather than on Barge 572, estimating that Plaintiff spent 90% or more of his time physically located on the pier.  (Mowers Decl. at ¶ 7.) Plaintiff contests this characterization, noting that Mowers supervised many employees, was often elsewhere on the job site, and did not watch Plaintiff and his crew every day.  (Pl.'s Reply Decl. at ¶ 2.)  Plaintiff stands by his estimate that he performed 75% of his work on Barge 572.  (Pl.'s Reply Decl. at ¶ 2.)  The Contractor Production Report and Daily Time Sheets attached to the Mowers Declaration do not indicate which tasks were performed by which workers, nor whether such tasks were performed primarily from Barge 572 or on the pier.  (Mowers Decl., Exs. 1 & 2.)

The Court makes the preliminary finding that the record does not support Mowers's contention that Plaintiff spent only 10% of his time working on Barge 572.  Rather, Plaintiff's explanation

11

of the many uses of Barge 572 for the crew of workers assigned to thereto – from changing into clothing, to eating lunch, to staging and preparing work to be installed on the pier, to cutting and driving piles – as well as his own firsthand knowledge of the conditions of his employment, compels the Court to preliminarily find that Plaintiff spent a substantial amount of time physically on Barge 572 itself.

## CONCLUSIONS OF LAW

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1333.  Plaintiff moves the Court to preliminarily enjoin Weeks from failing to pay maintenance and cure benefits under general maritime law until further order of the Court.  (Mot. for Order to Show Cause; dkt. entry no. 46, Pl.'s Br. at 2.)  The Court finds that Plaintiff has satisfied the elements of a preliminary injunction such that his requested relief is warranted.[5]  The findings and conclusions set forth in this memorandum opinion are preliminary only, based upon the state of the record at this stage in the litigation.  See Fed.R.Civ.P. 65(a).  The parties

---

[5]     To the extent the "Conclusions of Law" portion of this memorandum opinion contains findings of fact in addition to those expressly set out under the heading "Background-Factual Findings," they shall be deemed to be part of the findings of fact.

The "Conclusions of Law" subsections of this memorandum opinion generally do not contain citations to the evidence except after quoted language.  The record citations are set forth in the "Background-Factual Findings" section of this memorandum opinion.

have preserved all rights to present their disputes to a fact-finder for eventual adjudication on the merits.

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." Novartis Consumer Health v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 586 (3d Cir. 2002) (quotation and citation omitted).  To obtain such interim relief, a movant must demonstrate both a likelihood of success on the merits and the probability of irreparable harm absent the injunction.  Frank's GMC Truck Ctr. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988).  Thus, in determining whether to issue a preliminary injunction, the Court must consider whether:  (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will be irreparably injured by denial of the relief; (3) granting the preliminary relief will result in even greater harm to the nonmoving party; and (4) granting the preliminary relief is in the public interest.  BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 263 (3d Cir. 2000); ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996); see The Nutrasweet Co. v. Vit-Mar Enter., 176 F.3d 151, 153 (3d Cir. 1999).  The Court should issue an injunction "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." AT&T Co. v. Winback & Conserve Program, 42 F.3d 1421, 1427 (3d

13

Cir. 1994) (citation omitted); see The Nutrasweet Co., 176 F.3d at 153 (noting that a movant's failure to establish any one of the four elements renders a preliminary injunction inappropriate).

## I.   Reasonable Probability of Success on the Merits

The party seeking a preliminary injunction must demonstrate a "reasonable probability of eventual success in the litigation." Bennington Foods LLC v. St. Croix Renaissance Group, LLP, 528 F.3d 176, 179 (3d Cir. 2008). In evaluating whether a movant has satisfied this first part of the preliminary injunction standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits." Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir. 1975).

The Court must examine the likelihood of Plaintiff's success in showing that he is a seaman entitled to maintenance and cure benefits under general maritime law.[6] "Maintenance and cure is

---

[6] Plaintiff's claim for maintenance and cure benefits under general maritime law, but not his separate Jones Act claim, is at issue in this motion. However, the Court notes that the Supreme Court of the United States has defined "seaman" for Jones Act purposes by examining the meaning of the term under general maritime law. See Chandris, Inc. v. Latsis, 515 U.S. 347, 359-60 (1995) ("Jones Act coverage, like the jurisdiction of admiralty over causes of action for maintenance and cure for injuries received in the course of a seaman's employment, depends not on the place where the injury is inflicted . . . but on the nature

designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery." Vaughan v. Atkinson, 369 U.S. 527, 531 (1962).  Maintenance is the "living allowance for a seaman while he is ashore recovering from injury or illness." O'Connell v. Interocean Mgmt. Corp., 90 F.3d 82, 84 (3d Cir. 1996) (internal quotation omitted).  Cure is the "payment of medical expenses incurred in treating the seaman's injury or illness." Id. (internal quotation omitted).

"'[S]eaman' is a maritime term of art." McDermott Int'l, 498 U.S. at 342.  In ascertaining seaman status, "[i]t is not the employee's particular job that is determinative, but the employee's connection to a vessel." Id. at 354.  The Supreme Court of the United States has directed that "the essential requirements for seaman status are twofold." Chandris, 515 U.S.

---

of the seaman's service, his status as a member of the vessel, and his relationship as such to the vessel and its operation in navigable waters.") (internal quotation omitted); see also McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 342 (1991); Hall v. Diamond M Co., 732 F.2d 1246, 1248 (5th Cir. 1984) ("The standard for determining seaman status for purposes of maintenance and cure is the same as that established for determining status under the Jones Act."); Evans v. United Arab Shipping Co., 767 F.Supp. 1284, 1289 (D.N.J. 1991); cf. Lipfird v. Miss. Val. Barge Line Co., 310 F.2d 639, 641 (3d Cir. 1962) ("[T]he seaman's remedy for unseaworthiness under the general maritime law and his remedy for negligence under the Jones Act are but two aspects of a single cause of action.").

at 368.  First, the employee's duties must contribute to the function of the vessel in navigation or to the accomplishment of its mission.  <u>Id.</u>  Second, the employee's connection to the vessel must be substantial both in its duration and nature.  <u>Id.</u>  A vessel remains "in navigation" for Jones Act purposes even when at anchor, berthed, at dockside, or undergoing repairs.  <u>Id.</u> at 373-74.  Moreover, an employee need not "aid in navigation" in order to fall within seaman status.  <u>McDermott Int'l</u>, 498 U.S. at 355.

## A.  Plaintiff's Contribution to the Function or Mission of the Vessel

The first query in determining whether an employee is a seaman is whether the employee's duties contribute to the function of the vessel or the accomplishment of its mission.  <u>Chandris</u>, 515 U.S. at 368.[7]  Plaintiff contends that for the period of time covered by the Daily Time Sheets, Plaintiff was part of a crew of six men (five dockbuilders and a crane operator) who were regularly assigned to Barge 572, thereby functioning as the "crew" to Barge 572.  (Pl.'s Reply Br. at 5-6.)  The mission of Barge 572 was supporting and conducting construction of the pier.  See <u>Foulk v. Donjon Marine Co., Inc.,</u>

_____

[7] The parties do not dispute that Barge 572 is a "vessel in navigation."  <u>See</u> <u>Stewart v. Dutra Constr. Co.</u>, 543 U.S. 481 (2005) (holding that the <u>Super</u> <u>Scoop</u>, a large harbor dredge with only limited means of self-propulsion, was a "vessel").

16

144 F.3d 252, 258-59 (3d Cir. 1998) (finding that mission of crane barge was construction of artificial reef).

Plaintiff drove piles from, cut piles from, and prepared construction work on Barge 572, all in furtherance of its mission of constructing the pier.  Construction of a pier two miles from shore "is maritime in nature as it cannot be done on land," as evidenced by the fact that Weeks engaged a fleet of over twenty vessels at the construction site each workday.  (Mowers Decl., Ex. 1.)  Foulk, 144 F.3d at 259.  Therefore, we make a preliminary finding that as a construction worker assigned to help perform the work of Barge 572, Plaintiff was engaged in "doing the ship's work" and satisfies the first prong of the test for seaman status.  McDermott Int'l, 498 U.S. at 355.

**B.   Nature and Duration of Plaintiff's Connection to the Vessel**

The second step to determining seaman status requires the Court to consider the nature and duration of an employee's connection to the vessel.  Chandris, 515 U.S. at 368.  The Daily Time Sheets show that Weeks assigned Plaintiff, along with five other individuals, to Barge 572 every Monday, beginning on October 16, 2006.  Thus, Plaintiff had been working on Barge 572 for at least one month prior to the accident.[8]  The duration of

---

[8] Plaintiff states that he "spent at least 75 percent of [his] time on the crane barge during the 8-9 months that [he] was employed by Weeks," which the Court takes to mean Plaintiff was generally assigned to the same crane barge, Barge 572, for the

this assignment is substantial and supports a finding that Plaintiff is a seaman.  See Foulk, 144 F.3d at 260 (rejecting district court's ruling that an injured seaman's ten-day employment contract provided a "clearly inadequate temporal connection to vessels in navigation") (internal quotation omitted).  Additionally, Plaintiff expected his employment to last through the completion of construction but for his injury. (Pl.'s Decl. at ¶ 2.)

The Court must also consider the proportion of time Plaintiff spent working in the service of the crane barge each day, which presents a closer question.  Chandris, 515 U.S. at 372.  Plaintiff reported to work every day on Barge 572, where he would use a shanty to change into his work clothes.  The fact that Plaintiff reported to work on Barge 572 on a daily basis, as opposed to sleeping on the vessel, does not impact seaman status. See Del. River & Bay Auth. v. Kopacz, Nos. 08-4029, 08-4086, 2009 WL 3064708, at *4 (3d Cir. Sept. 25, 2009) (holding that commuter seamen are equally entitled to maintenance as their "blue water counterparts").  Plaintiff kept his construction tools on Barge

---

entire duration of his employment.  (Pl.'s Decl. at ¶ 2.)
However, the Court focuses on the time period detailed in the
Daily Time Sheets because those sheets provide details about the
nature of the work performed.  The Court's preliminary finding
that Plaintiff's connection to Barge 572 was substantial in
nature and duration does not preclude the parties from presenting
additional evidence on this point in future proceedings in this
case.

572.  Much of his work, such as cutting and driving piles and repairing the pile driving hammer, occurred on Barge 572.  At the time of the accident, Plaintiff was standing on a piece of concrete suspended by the crane itself, twelve to fifteen feet above the ground, but connected by the crane to Barge 572.

Based on the Plaintiff's description of his work day, the fact that he was regularly and consistently assigned to work on a particular crane barge, and the nature of that work – which included assisting in handing lines to move the crane barge several times per week – the parties' differences in opinion as to the percentage of each workday Plaintiff spent physically on Barge 572 need not preclude the Court, at this juncture, from finding that Plaintiff has shown a reasonable probability of success in showing that his connection to Barge 572 was substantial in both duration and nature.  See LaCount v. Southport Enters., No. 05-5761, 2007 WL 1892097, at *5 (D.N.J. June 29, 2007) (noting that courts should determine the substantiality of the employment relationship by the totality of the circumstances, toward the "ultimate inquiry" of "whether the worker in question is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a

given time.") (quoting Chandris, 515 U.S. at 370); see also
Elliott, 98 F.3d at 54.[9]

### C.   Plaintiff's Entitlement to Maintenance and Cure

Having found Plaintiff to have established a reasonable
probability of success in showing he is a seaman under general
maritime law, the Court turns to the question of whether he is
similarly likely to show entitlement to maintenance and cure
benefits.

The right of seamen to receive maintenance and cure benefits
is long-standing and well-established, and any doubts concerning
a seaman's entitlement to such benefits must be resolved in favor
of the seaman.  Vaughan, 369 U.S. at 531-32.  Weeks argues that
Plaintiff is not entitled to maintenance and cure benefits,
because his ankle injury has already reached maximum medical
improvement.  (Weeks Br. at 22.)

A maritime employer's obligation to pay maintenance and cure
benefits to an injured seaman continues "until the seaman has
reached the point of maximum cure, that is until the seaman is

---

[9] In Chandris, the Supreme Court suggested, as a guideline,
that an employee who spends 30% of more of the workday aboard a
vessel has a substantial enough connection to the vessel to
qualify as a seaman.  515 U.S. at 371.  Mowers's estimate that
Plaintiff spent 10% of his time on Barge 572 and Plaintiff's
contention that he spent 75% of his time on Barge 572 fall on
either side of this guideline.  However, the Contractor
Production Reports and Daily Time Sheets provide no details as to
which activities were performed on Barge 572 as opposed to the
pier, and thus provide no support for Mowers's estimate.

cured or his condition is diagnosed as permanent and incurable."
Barnes v. Andover Co., L.P., 900 F.2d 630, 633-34 (3d Cir. 1990).
Weeks contends that "plaintiff's doctors have indicated that he
is permanently disabled, and that his condition will not
improve."  (Weeks Br. at 22.)  However, the physicians' reports
attached to the Langan Declaration indicate only that Plaintiff
is unable to return to construction work.  Nothing in the record
supports the conclusory and vague statement of Dr. Matthew
Roberts that Plaintiff's injury is "a permanent condition,"
particularly in light of Roberts's own recommendations that
Plaintiff undergo hardware removal and distraction arthroplasty
and, failing that, ankle arthrodesis.  (Langan Decl., Ex. M,
Report of Dr. Matthew Roberts dated 1-16-08.)  Weeks's own
examining physician, Fries, opined that "[r]econstructive surgery
is required" and recommended that Plaintiff undergo ankle
arthrodesis or a complete joint replacement.  (Langan Decl., Ex.
I, 2-19-07 Report of Dr. Ian Fries.)  Rehabilitation from either
of these treatments would take as long as one year.  (Id.)  Weeks
in fact has offered to pay for these procedures.  (See Langan
Decl., Ex. N, 12-4-08 Letter from Weeks's Counsel to Plaintiff's
Counsel (stating that Fries's recommended ankle arthrodesis would
be curative in nature).)  Thus, Weeks's argument that Plaintiff
has reached maximum medical improvement lacks merit.

An obvious area for improvement of Plaintiff's medical condition is removal of the broken screw in his leg.  Meanwhile, Plaintiff's overall condition worsens; he now experiences pain in his back and left leg due to the lack of treatment of his injured right ankle.

Plaintiff's preferred treatment, distraction arthroplasty, is curative because it offers the possibility of medical improvement, including regeneration of cartilage.  The fact that Fries believes the distraction arthroplasty is a "novel technique" undermines Weeks's argument that the procedure is curative rather than palliative.  See Cox v. Dravo Corp., 517 F.2d 620, 626 (3d Cir. 1975) (noting that a totally disabled seaman no longer entitled to maintenance and cure benefits could institute a later proceeding for "treatment of a curative nature such as a new drug or a new surgical technique").

The courts are to liberally interpret the obligation of maritime employers to provide maintenance and cure benefits to injured seamen.  Vaughan, 369 U.S. at 531-32.  "Maintenance and cure must be so inclusive as to be relatively simple, and it can be understood and administered without technical considerations. It has few exceptions or conditions to stir contentions, cause delays and invite litigation."  Farrell v. United States, 336 U.S. 511, 516 (1949).  Thus, Weeks's objection to Plaintiff's preferred treatment cannot preclude this Court's finding that

22

Plaintiff has shown a substantial likelihood of success on the merits of his claim that he is a seaman entitled to maintenance and cure benefits.

## II. Irreparable Injury

"[A] party seeking a preliminary injunction must make 'a clear showing of immediate irreparable injury.'" LCN Enters., Inc. v. City of Asbury Park, 197 F.Supp.2d 141, 153 (D.N.J. 2002) (quoting Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989)).  To make such a showing, "a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.  Economic loss does not constitute irreparable harm."  Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (citations and quotations omitted).  Irreparable harm must be of a peculiar nature and must be incapable of pecuniary measurement.  See Kos Pharms. v. Andrx Corp., 369 F.3d 700, 727 (3d Cir. 2004); Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91-92 (3d Cir. 1992).

The Court finds that Plaintiff has shown he will suffer irreparable harm if the preliminary injunction is not granted with respect to both maintenance and cure.  As to maintenance, Plaintiff has fallen into dire financial straits due to Weeks's discontinuation of payment of benefits and Plaintiff's inability to work as a dockbuilder.  This type of harm is different from mere economic loss, because he faces the loss of his home and

inability to pay for life's necessities while he pursues relief in this Court.  See Thornsberry v. Nugent Sand Co., No. 03-28, 2003 WL 23164408, at *1 (W.D. Ky. July 25, 2003) (granting seaman's motion for preliminary injunction directing defendant to pay maintenance and cure benefits and finding irreparable harm because "[a monetary] award at a later time will not assuage the hardship he will be facing until then").

Preliminary injunctions are appropriate when a party "will be irreparably injured pendente lite if relief is not granted to prevent a change in the status quo."  Acierno, 40 F.3d at 653 (quotation omitted).  Weeks argues implicitly that the Court should preserve the status quo of Weeks's current non-payment of benefits.  (Weeks Br. at 10.)  The Court disagrees.  Plaintiff's ability to maintain a modest standard of living while he pursues available remedies for his injury is also a status quo worth preserving.  Weeks's argument that Plaintiff cannot show irreparable harm because he has rejected Weeks's offers to reinstate payment of LHWCA benefits if Plaintiff discontinues his Jones Act claims, and to pay for the conventional treatment suggested by Weeks's doctor but not Plaintiff's preferred treatment, only highlights Plaintiff's vulnerable position.  (Weeks Br. at 31.)

With respect to cure, Plaintiff's condition apparently continues to worsen.  He has been completely without medical care

24

for the serious injury to his right ankle, causing new problems in his back and left leg because he cannot walk properly.  The Court finds that Plaintiff's worsening condition and unnecessary decompensation pose a clear and currently existing threat of irreparable harm if his injury continues to go untreated.  See Bolding v. Hunter Marine Transp., No. 05-214, 2006 WL 938943, at *2 (W.D. Ky. Apr. 7, 2006) (granting preliminary injunction for cure and finding irreparable harm where plaintiff would have to wait for a final determination of his claim to have the surgery recommended by his treating physician); McMickle v. Jantran, Inc., No. 05-186, 2005 WL 2175728, at *2-*3 (N.D. Miss. Sept. 7, 2005) (finding substantial threat of irreparable harm where plaintiff was in constant pain, could not afford the cost of proper medical care, had no other source of income, and was reduced to borrowing money from friends in order to pay basic living expenses, circumstances the "long-standing right of seamen to maintenance and cure" was designed to prevent).

## III. Harm to Nonmoving Party

The Court must also analyze whether Weeks will suffer irreparable harm if the preliminary injunction is granted.  Kos Pharms., 369 F.3d at 727.  If the Court finds that such temporary relief may irreparably harm the defendant, then it must "balance the hardships" to ensure that the injunction does not harm the defendant more than denial of the injunction would harm the

plaintiff.  Id.; see also Constr. Drilling v. Chusid, 63
F.Supp.2d 509, 513 (D.N.J. 1999) (stating that courts must
"balance the hardships to the respective parties" in determining
whether to issue a preliminary injunction).  The "injury a
defendant might suffer if an injunction were imposed may be
discounted by the fact that the defendant brought that injury
upon itself." Kos Pharms., 369 F.3d at 728 (citation and
quotations omitted).

Weeks contends that if a jury eventually determines that
Plaintiff is not a seaman, any benefits paid to Plaintiff prior
to that determination will not be able to be disgorged later.
(Weeks Br. at 32.)  Weeks also points to Plaintiff's concurrent
proceedings before the OWCP for LHWCA benefits and argues that
Plaintiff could receive a windfall if the amount of maintenance
and cure benefits paid pursuant to a preliminary injunction
exceeds the LHWCA award, or if Plaintiff is awarded both
maintenance and cure and LHWCA benefits, because the two are
mutually exclusive remedies and this Court lacks subject matter
jurisdiction over the issue of Plaintiff's entitlement to LHWCA
benefits.  (Weeks Br. at 32-33.)

Weeks's arguments are unpersuasive for the same reasons the
Court is disinclined to require Plaintiff to post a monetary bond
upon granting the injunction:  Plaintiff seeks maintenance and
cure benefits in an amount significantly less than the LHWCA

benefits Weeks previously paid Plaintiff.  (Pl.'s Decl. at ¶ 9;
Pl.'s Br. at 14-15; see infra at 30-31.)  Weeks's concerns about
the possibility of a windfall to Plaintiff are unfounded, as the
LHWCA "generally reflects a policy of avoiding double recovery."
Ingalls Shipbuilding, Inc. v. Director, Office of Workers' Comp.
Programs, 519 U.S. 248, 261 (1997).  See 33 U.S.C. § 903(e)
("[A]ny amounts paid to an employee for the same injury,
disability, or death for which benefits are claimed under this
chapter pursuant to [the Jones Act] shall be credited against any
liability imposed by this chapter.").

     The facts of this case make clear that Plaintiff is entitled
to some relief, either as a seaman entitled to maintenance and
cure and Jones Act remedies, or under the LHWCA.  Receipt or
pursuit of LHWCA benefits does not foreclose an injured worker's
ability to proceed on an alternative theory that he is a seaman
under the Jones Act and general maritime law.  See generally Sw.
Marine, Inc. v. Gizoni, 502 U.S. 81 (1991).  The Court finds that
the clear threat of immediate injury to Plaintiff if the
preliminary injunction is not granted heavily outweighs the far
less plausible threat of harm voiced by Weeks.  The
administrative law judge who would determine Plaintiff's
entitlement to LHWCA benefits would be unlikely to disregard
maintenance and cure benefits paid in making a putative award.
Even if Plaintiff's LHWCA claims were in fact resolved in a way

that provided Plaintiff a "windfall," Weeks makes no compelling
argument why such monies could not be promptly disgorged or that
such prospective overpayment would irreparably harm Weeks.

## IV.  The Public Interest

The preliminary injunction analysis requires the Court to
consider the public interest.  See AT&T Co., 42 F.3d at 1427 n.8
(noting the public interest will almost always favor the
plaintiff, if the plaintiff demonstrates both a likelihood of
success on the merits and irreparable injury).

The strong public policy underlying the centuries-old
seaman's remedy of maintenance and cure benefits applies here.
See Harden v. Gordon, 11 F.Cas. 480 (No. 6,047) (C.C. Me. 1823)
(Story, J.) ("If some provision be not made for [seamen] in
sickness at the expense of the ship, they must often in foreign
ports suffer the accumulated evils of disease, and poverty, and
sometimes even perish from the want of suitable nourishment
. . . . [T]he merchant himself derives an ultimate benefit
[because i]t encourages seamen to engage in perilous voyages with
more promptitude, and at lower wages.").

The Court of Appeals for the Third Circuit recently noted
that courts continue to construe maintenance and cure liberally
for public policy reasons, their analysis "informed by nearly two
centuries of jurisprudence consistently expand[ing] the scope of
the right [to maintenance]." Kopacz, 2009 WL 3064708, at *4.

28

> Since Harden was decided almost 200 years ago, the lot
> of the 'poor and friendless' seaman has improved
> considerably . . . The emergence of . . .
> contractually-guaranteed benefits, however, has not
> diminished our historic solicitude toward seamen, who
> continue to be viewed by the law as 'wards of the
> admiralty.' . . . Accordingly, maintenance . . . has
> retained its vitality in the modern era.

Id. at *2 (quoting Barnes, 900 F.2d at 636-37); see also Atl.
Sounding Co. v. Townsend, 129 S.Ct. 2561, 2568 (2009).  Granting
Plaintiff's motion will serve the public interest by "ensur[ing]
compliance with the long-standing doctrine of maintenance and
cure."  McMickle, 2005 WL 2175728, at *3; see also Thornsberry,
2003 WL 23164408, at *2 ("[A] strong public policy exists in
favor of establishing generous and immediate maintenance payments
for seamen.").

The fact that Plaintiff has taken a part-time job as a
cabinet maker in order to make his mortgage payments does not
lessen the public interest in requiring a maritime employer to
provide maintenance and cure benefits to its injured employee.
Vaughan, 369 U.S. at 533 ("It would be a sorry day for seamen if
shipowners, knowing of the claim for maintenance and cure, could
disregard it, force the disabled seaman to work, and then evade
all or part of their legal obligation by having it reduced by the
amount of the sick man's earnings.").  Thus, the Court finds that
the public interest favors granting the preliminary injunction.

**CONCLUSION**

The Court, for the reasons stated <u>supra</u>, will grant the motion for a preliminary injunction.  The Court will order Plaintiff to submit a detailed declaration explaining his maintenance expenses and supporting documentation as to his mortgage; homeowners' insurance; utilities including gas, water, and electric; food; and laundry.  <u>See</u> <u>Barnes</u>, 900 F.2d at 644.

Although Rule 65(c) generally requires that a preliminary injunction may be granted "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," Fed.R.Civ.P. 65(c), the Court may waive this security requirement.  <u>See, e.g.,</u> <u>McCormack v. Township of Clinton</u>, 872 F.Supp. 1320, 1328 (D.N.J. 1994).  In determining whether to do so, the Court must "first weigh the potential loss to the enjoined party against the hardship that a bond requirement would impose on the applicant," then ask whether the application for relief seeks to enforce a significant federal right or matter of public interest.  <u>Temple Univ. v. White</u>, 941 F.2d 201, 219 (3d Cir. 1991).

The Court concludes that it may waive the security requirement in this case.  The potential for monetary harm to Weeks is minimal, as Plaintiff has established that he is likely to succeed on the merits of his action for maintenance and cure

30

benefits.  Even if he is ultimately found not to be a seaman but rather a maritime worker subject to the LHWCA scheme, the maintenance and cure benefits he seeks amount to several hundred dollars a week less than what Weeks would owe him in LHWCA benefits.  Moreover, for the reasons set forth herein, a bond requirement would pose an extreme hardship on Plaintiff, who is struggling to pay past due bills.  The obligation to provide maintenance and cure benefits to injured seamen implicates the public interest.  Thus, the Court finds it appropriate to impose only a nominal bond requirement on Plaintiff.

Although Plaintiff moves the Court to direct Weeks to pay maintenance in the amount of $93.34 per day from October 20, 2008 (the day Weeks discontinued LHWCA payments) until further order of the Court, plus $3,630 for the cost of Plaintiff's borrowing from his annuity, the Court finds that prospective relief only is appropriate in this instance.  (Pl.'s Br. at 15.)  As to cure, Weeks will be directed to pay all of Plaintiff's reasonable medical expenses, including distraction arthroplasty surgery and post-surgical treatment, and any appropriate medication.

The Court will issue an appropriate order separately.


                    s/ Mary L. Cooper
                 **MARY L. COOPER**
                 United States District Judge


Dated:    October 28, 2009