**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOSEPH COLLICK, | : | CIVIL ACTION NO. 08-5120 (MLC) |
| | : | |
| | : | **MEMORANDUM OPINION** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| WEEKS MARINE, INC., et al., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |
| WEEKS MARINE, INC., | : | |
| | : | |
| | : | |
| Third-Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| EVANSTON INSURANCE COMPANY, | : | |
| | : | |
| Third-Party Defendant. | : | |
| _____ | : | |

**COOPER, District Judge**

Plaintiff, Joseph Collick ("Collick"), commenced this action against Weeks Marine,

Inc. ("Weeks") and Haztek, Inc., seeking recovery for his injuries under the Jones Act and

the general maritime remedies of maintenance, cure, and unseaworthiness.  (See dkt. 24.)[1]

Plaintiff, in the alternative, seeks recovery under the Longshore and Harbor Workers'

_____

[1] The Court will cite to the documents filed on the Electronic Case Filing System ("ECF") by referring
to the docket entry numbers by the designation of "dkt."  Pincites reference ECF pagination.

Compensation Act ("LHWCA").  (See id.)  Weeks now moves for summary judgment as to all claims asserted against it.  (See generally dkt. 248.)  Collick cross-moves for summary judgment against Weeks on: (1) Collick's status as a Jones Act seaman; and (2) Weeks' liability to Collick for Jones Act negligence.  (See generally dkt. 249.)

The cross-motions for summary judgment are opposed and fully briefed.  (See dkt. 248-22; dkt. 249-3; dkt. 261; dkt. 262; dkt. 267; dkt. 268).  The Court will resolve these cross-motions without oral argument pursuant to Local Civil Rule 78.1(b).  For the reasons stated below, the Court will deny the parties' cross-motions for summary judgment on the issue of Collick's status as a Jones Act seaman, Jones Act negligence, and the general maritime remedies of maintenance, cure, and unseaworthiness.  The Court will deny Weeks' motion for summary judgment on the issue of liability under Section 905(b) of the LHWCA.

## BACKGROUND

The Court writes for the parties and assumes their knowledge of the facts and extensive procedural history of this action.  The Court includes a recitation of the facts of the action as it relates to these cross-motions.[2]

Collick is a marine construction worker and member of the Dockbuilders and Divers Union.  (See dkt. 248-2 at 3; dkt. 249-2 at 3.)  Weeks is a marine construction company that also provides dredging, marine transportation, and salvage services.  (See dkt. 248-2 at 2;

---

[2] This Memorandum Opinion addresses the cross-motions for summary judgment filed by Collick and Weeks on the issues of Collick's seaman status under the Jones Act, and Weeks' liability under the Jones Act, LHWCA, and general maritime remedies.  (See dkt. 248; dkt. 249.)  The Court will address the cross-motions for summary judgment filed by Third-Party Plaintiff, Weeks, and Third-Party Defendant, Evanston Insurance Co.—which was previously stayed and later reactivated by order of the Magistrate Judge—in a separate Memorandum Opinion.  (See dkt. 219; dkt. 255.)

dkt. 249-2 at 2.)  This case arises out of injuries that Collick sustained while employed by Weeks during the rehabilitation of a pier at the Earle Naval Weapons Station in Leonardo, New Jersey (hereinafter "the Earle Project").  (See dkt. 248-2 at 2; dkt. 249-2 at 2.)

## I.  The Earle Project

The pier at the Earle Project is divided into four parts and extends into Sandy Hook Bay in a trident shape.  (See dkt. 248-2 at 2; dkt. 249-2 at 3.)  The area connecting the shore to the crux of the trident is known as Pier 1, and the middle prong of the trident is known as Pier 3.  (See dkt 248-2 at 2; dkt. 249-2 at 3.)  Weeks was hired by the United States Navy ("U.S. Navy") to demolish and reconstruct Pier 3.  (See dkt. 248-2 at 2; dkt. 249-2 at 2.)  The Earle Project began in 2005 and ended in 2007.  (See dkt. 249-2 at 2.)  This is a photograph of the entire pier, showing Pier 3 as the middle prong of its trident sections.



(See dkt. 249-3 at 4.)

## II.  Collick's Employment with Weeks

Collick began working for Weeks at the Earle Project in March 2006.  (See dkt. 248-2 at 4; dkt. 249-2 at 3.)  On a typical work day, Collick drove to a shore-side parking lot, where

3

he and the other construction workers would then drive through the Earle Naval Weapons Station and onto the pier.  (See dkt 248-2 at 4; dkt. 249-2 at 4.)  Collick would then take a tugboat to the barge, where he would prepare for the day's work.  (See dkt. 248-2 at 4; dkt. 249-2 at 4–5.)

For approximately the first six months of his employment, Collick was assigned to a team to drive piles for the new pier.  (See dkt. 248-2 at 5; dkt. 249-2 at 4.)  Collick, along with two other dockbuilders and a foreman, completed the following steps during the pile-driving phase: (1) setting and positioning the frame, which acted as the template for the dockbuilders to drive piles into the ocean floor;[3] (2) "hoist[ing] the piles from a material barge with a crane and mov[ing] them into position in the frame;" (3) "driving the piles with a vibratory hammer" until the pile was plumb; and (4) using a diesel hammer to complete driving the piles into the ocean floor.  (See dkt. 248-2 at 5–7.)  After the pile-driving phase was completed, Collick was assigned to burn and cut the piles.  (See dkt. 248-2 at 7.)  Collick then placed precast pier caps on each pile.  (See id.)  Collick testified that he physically worked on the precast pier caps while completing these tasks.  (See id.)  At his deposition, he identified several photographs that depict employees working on concrete blocks, or the precast pier caps, above the ocean.  (See, e.g., dkt. 248-9 at 4, 8, 14; dkt. 248-10 at 1, 10.)  One of these photographs is reproduced below:

---

[3] Collick testified that working on the frame was similar to an oil rig, and that it was "humongous" or about the size of "half the width of the pier."  (See dkt. 248-6 at 51, 65.)



(Dkt. 248-10 at 1.)

At the completion of the pile-driving phase of the pier construction, Collick was reassigned to another Weeks barge to place precast concrete on the pier. (See dkt. 248-2 at 7; dkt. 249-2 at 5.)[4] This second task included building ramps and platform columns, pouring cement, and building beams for the various parts of the pier. (See dkt. 248-2 at 7–8; dkt. 249-2 at 5.) See also Background, Sec. III, infra. Collick testified that he was also required to move the barge and handle the lines from the tugboats when necessary. (See dkt. 249-2 at 5.) At his deposition, he identified several photographs showing the barge and workers placing the precast concrete pieces during the Earle Project. (See, e.g., dkt. 248-9, dkt. 248-10, dkt. 248-11, dkt. 248-12, dkt. 248-13, dkt. 248-14.) One of these photographs is reproduced below:

---

[4] The parties mislabel the different crane barges on which Collick drove piles. (See, e.g., dkt. 248-2 at 9; dkt. 249-2 at 4, dkt. 262-1 at 13–14.) Weeks submits that Barge 572 was used to drive piles, whereas Collick submits that Barge 532 was used to drive piles. The parties do not suggest that this mischaracterization creates a genuine dispute of material fact. As such, the Court will refer only to "the barge." The Court notes that Barge 572 was registered with the United States Coast Guard as an "industrial vessel." (See dkt. 249-2 at 9.)



(Dkt. 248-9 at 12.)

Collick estimated that he spent about 60 to 70 percent of his time aboard the barge.

(See dkt. 252-5 at 181; see also dkt. 249-2 at 5.)  The barge's crane operator estimated that

Collick spent 50 to 60 percent of his time aboard the barge.  (See dkt. 252-8 at 28; see also

dkt. 249-2 at 5.)[5]  However, Daniel Mowers ("Mowers"), the Earle Project construction

superintendent, testified that Collick "performed his work almost exclusively on the . . .

[p]ier," and estimated that Collick spent 90 percent "or more of his time performing his

construction tasks physically located on the . . . [p]ier."  (See dkt. 248-2 at 8.)

## III.    Collick's Time Sheets

Weeks maintained daily time sheets for all of its employees at the Earle Project.  (See

dkt. 249-2 at 11.)  Each time sheet reflects a "summary of total daily hours."  (See id.)  For

---

[5] The crane operator's full testimony stated that Collick spent "[a]t least 50/50.  Maybe, maybe 60/40,
more on the barge than on land."  (See dkt. 252-8 at 28.)

the period between October 9, 2006 and November 17, 2006, Collick was recorded as having

completed the following tasks: "installing bollards; erecting loading ramps and platforms;

forming and stripping bollards and platform columns; erecting rail block outs; erecting utility

gallery; pouring cement for bollard and platform columns; forming and stripping cap joints;

forming, pouring, and stripping concrete plugs; forming and stripping joints; pouring cement

for pile plugs; erecting pier crane rail beams; erecting platform beams; erecting box beams;

preparing deck forms; pouring cement for cap joints; pouring cement for column cap walls;

pouring cement for pier deck; and erecting pier crane beam." (See dkt. 248-2 at 7–8; see also

dkt. 249-2 at 5; dkt. 252-19; dkt. 252-20; dkt. 252-21.)

Each Monday time sheet includes additional information, which appears to be the

location or a general descriptor of each employee's assignment for that particular week. (See

generally dkt. 252-18, dkt. 252-19, dkt. 252-20.) For example, those workers assigned to

"Columns" on a Monday time sheet fulfilled such job duties as forming and stripping

bollards and platform columns for the duration of the week. (See dkt. 252-19 at 25, 33, 42,

49, 57.) From October 9, 2006 to the date of Collick's accident, Weeks' Monday time sheets

indicate Collick was assigned to "WMI 750" and "WMI 572," which are designations for

different barges. (See dkt. 249-2 at 9, 11.)

## IV.   Collick's Accident

On November 17, 2006, the barge's crane was being used by Collick and other

dockbuilders to position a piece of precast concrete onto the pier. (See dkt. 248-2 at 12; dkt.

249-2 at 6–7.) Collick and the other workers attempted to set the piece of precast concrete

onto the pier, but it "could not be set flush on the supporting beams of the pier because it had

7

become 'hung up' on candy cane rebar protruding both from it and the supporting beam onto which they were attempting to place the precast."  (See dkt. 249-2 at 7; see also dkt. 248-2 at 12.)  Collick's supervisors—Mowers and the foreman—directed him to use a tool to bend the rebar because the U.S. Navy instructed Weeks to avoid burning the rebar.  (See dkt. 249-2 at 7.)

Collick testified that Mowers passed him a hickey tool, which Collick described as an "iron worker tool" that is "a pipe with . . . a hook . . . on it that you hooked onto [the rebar] and bent it."  (See dkt. 252-5 at 183.)  Collick climbed onto the supporting beam ("Y-beam") upon which they were attempting to place the precast concrete.  (See dkt. 248-2 at 12; dkt. 249-2 at 8.)  As Collick was using the hickey to bend the rebar out of the way, the hickey slipped off the rebar and Collick fell at least ten feet to the lower deck of the pier, pictured below.  (See dkt. 248-2 at 12; dkt. 249-2 at 8; see also dkt. 248-7 at 3.)  Collick sustained a right ankle fracture.  (See dkt. 248-2 at 12.)



(Dkt. 248-7 at 3.)

## DISCUSSION

## I.    Applicable Law

### A.    Legal Standard: Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The non-movant must then present evidence that raises a genuine dispute of material fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is genuine if the evidence is

9

sufficient to permit a reasonable jury to return a verdict for the non-moving party." Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011) (internal citation and quotation omitted). This evidence may include "citing to particular parts of materials in the record" or a "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A)–(B).

### B.    Legal Standard: Jones Act

#### 1.    Seaman Status

The Jones Act provides that "[a] seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104. To qualify as a seaman under the Jones Act, an employee must satisfy two requirements: (1) the "employee's duties must contribute to the function of the vessel or to the accomplishment of its mission;" and (2) the employee "must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." Chandris, Inc. v. Latsis, 515 U.S. 347, 368 (1995) (internal quotation omitted).

Several principles guide this Court's analysis of the first Chandris prong. First, an employee must show that he or she has "perform[ed] the work of the vessel," but it is not necessary that the employee aid the vessel in navigation. See McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 355 (1991). The focus of the court's examination must be on the "more enduring relationship" of the employee to the vessel, rather than a mere "snapshot" that examines "the situation as it exists at the time of the injury." Chandris, 515 U.S. at 358.

At the same time, a court must refrain from considering the "employee's entire work history," and instead "consider only the nature of the employee's basic job assignment as it existed at the time of injury."  See Shade v. Great Lakes Dredge & Dock Co., 154 F.3d 143, 149 (3d Cir. 1998)

The second prong of Chandris is intended "to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation."  Chandris, 515 U.S. at 368.  In Chandris, the Court affirmed the Fifth Circuit's 30 percent rule, which provides that "a worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman."  See id. at 349.  The Court found the Fifth Circuit's analysis an "appropriate rule of thumb for the ordinary case," but noted that the "figure . . . serves as no more than a guideline, . . . and departure from it will certainly be justified in appropriate cases."  See id. at 371.

The Third Circuit has adopted the Fleet Seaman Doctrine to determine whether an employee has a substantial connection to a vessel in both duration and nature.  See Shade, 154 F.3d at 151; see also Reeves v. Mobile Dredging & Pumping Co., Inc., 26 F.3d 1247, 1256 (3d Cir. 1994) ("[W]e hold that the Fleet Seaman Doctrine shall be the rule of law in this circuit in analyzing Jones Act cases because we believe, . . . that the doctrine comports well with and flows logically from Supreme Court precedent.")  The scope of the Fleet Seaman Doctrine is described as follows:

> The Fleet Seaman Doctrine in our view applies to an employee, one who is predominantly assigned by his employer to a navigable vessel, but who occasionally is assigned by that same employer to non-navigable vessels.  It

> would also apply to one who is assigned to a number of navigable vessels and
> spends some time on shore. . . .  Thus, we adopted the doctrine to afford Jones
> Act protection to these types of employees, because stripping seaman status
> from such an employee, or allowing that same employee to oscillate between
> seaman and non-seaman status . . . would be a travesty of justice.

Shade, 154 F.3d at 151 (internal citation and quotation omitted).

### 2.    Jones Act Negligence

A seaman may bring a negligence action against his employer under the Jones Act,

and is required to prove the traditional elements of duty, breach, notice, and causation.  See

46 U.S.C. § 30104; see also Walker v. Walker Bros. Fisheries, LLC, No. 12-4223, 2014 WL

7179601 (D.N.J. Dec. 17, 2014).  "[T]he standard of proof for causation when asserting

negligence under the Jones Act is relaxed," or "featherweight."  Fasold v. Del. River & Bay

Auth., 117 Fed. App'x 836, 838 (3d Cir. 2004).  "Causation is satisfied if the proofs justify

with reason the conclusion that employer negligence played any part, even the slightest, in

producing the injury."  Id. (internal quotation and citation omitted).  Any negligence on the

part of the seaman "will not defeat one's right to recovery," as "[c]ontributory negligence is

not an absolute defense under maritime law, but rather . . . is a basis to apportion damage."

Id.

### C.    Legal Standard: General Maritime Remedies

A seaman, under general maritime law, can recover maintenance and cure from a

vessel owner or employer when the seaman is injured or becomes ill in the service of a ship.

Wilander, 498 U.S. at 341; O'Connell v. Interocean Mgmt. Corp., 90 F.3d 82, 84 (3d Cir.

1996).  Maintenance is the "living allowance for a seaman while he is ashore recovering

from injury or illness."  O'Connell, 90 F.3d at 84 (internal quotation omitted).  Cure is the

"payment of medical expenses incurred in treating the seaman's injury or illness." Id. (internal quotation omitted).  An employer or vessel owner must provide maintenance and cure "until the seaman has reached the point of maximum cure, that is until the seaman is cured or his condition is diagnosed as permanent and incurable." Id. (internal quotation omitted).  Maintenance and cure is a contractual obligation independent of the employer or vessel owner's negligence.  See id.

A vessel owner or employer may also be liable "for injuries received by a seaman in consequence of the unseaworthiness of the ship, or a failure to supply and keep in proper appliances appurtenant to the ship." The Osceola, 189 U.S. 158, 175 (1903), superseded by statute, 46 U.S.C. § 30104.[6]  Vessel owners or employers are under "a duty . . . to furnish a vessel and appurtenances reasonably fit for their intended use." Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960).  "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." Id.

### D.  Legal Standard: Section 905(b) of the LHWCA

#### 1.  LHWCA Status

While the Jones Act permits a seaman to bring a negligence action against the seaman's employer, as well as causes of action against the employer for wages

---

[6] The Jones Act overruled The Osceola insofar as The Osceola's holding prohibited seamen and their families "from recovering for injuries or death due to [the seaman] employers' negligence." Atl. Sounding Co., Inc. v. Townsend, 557 U.S. 404, 415 (2009).  The Jones Act was not intended to "sweep[] aside general maritime law remedies." See id. (citation omitted).

(maintenance) and medical expenses (cure), the LHWCA similarly permits a longshoreman

or harbor worker to bring a: (1) no-fault workers' compensation claim against his or her

employer; and (2) negligence claim against the vessel for injury.  See 33 U.S.C. §§ 904(a),

905(b).[7]  Collick's Section 905(b) vessel negligence claim is the only LHWCA cause of

action at issue before this Court.[8]

> Section 905(b) of the LHWCA provides that:
>
> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly . . . .

33 U.S.C. § 905(b).

A statutorily-covered employee is defined as, "any person engaged in maritime

employment, including any longshoreman or other person engaged in longshoring

---

[7] The LHWCA specifically excludes from its coverage "a master or member of a crew of any vessel," which is a refinement of the term "seaman" used in the Jones Act.  33 U.S.C. § 902(3); Chandris, 515 U.S. at 355–56.  Thus, seamen under the Jones Act are excluded from coverage under the LHWCA. See Chandris, 515 U.S. at 356; see also Foulk v. Donjon Marine Co., Inc., 144 F.3d 252, 258 (3d Cir. 1998) (recognizing that Jones Act and LHWCA are mutually exclusive).

[8] Collick has already received workers' compensation for medical expenses and statutory benefits from Weeks, as his employer, under the LHWCA.  (See dkt. 66 at 3–5 (discussing Weeks' voluntary payment of LHWCA benefits and Collick's administrative action seeking LHWCA benefits with the Office of Workers' Compensation Programs.))  If Weeks were determined to be liable to Collick for damages, either under the Jones Act or under Section 905(b) of the LHWCA, there could be a workers' compensation lien asserted to offset a portion of these damages because the LHWCA "generally reflects a policy of avoiding double recovery."  Ingalls Shipbuilding, Inc. v. Director, Office of Workers' Comp. Programs, 519 U.S. 248, 261 (1997); see also 33 U.S.C. § 903(e) ("[A]ny amounts paid to an employee for the same injury, disability, or death for which benefits are claimed under this chapter pursuant to any other workers' compensation law or [the Jones Act] shall be credited against any liability imposed by this chapter.").

operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker." Id. § 902(3).  In certain circumstances, a longshoreman or harbor worker may be employed by the vessel owner.  These "dual capacity" cases, in which the employer and vessel owner are the same entity, are permitted only if the employer-owners were acting in their capacity as vessel owners.  See, e.g., Griffith v. Wheeling Pittsburgh Steel Corp., 521 F.2d 31, 44 (3d Cir. 1975); Casey v. Commerce Const. Corp., No. 08-955, 2010 WL 2761102, at *3 (D.N.J. July 8, 2010); Lacount v. Southport Enters., No. 05-5761, 2007 WL 1892097, at *6–*7 (D.N.J. June 29, 2007).

### 2.   Section 905(b) Negligence

A longshoreman or harbor worker's claim against the vessel owner for Section 905(b) negligence requires the longshoreman to prove the traditional negligence elements of duty, breach, notice, and causation.  See Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 166-67, 172-76 (1981).  With respect to a vessel owner's duty to the longshoreman, the Scindia Court has held that vessel owners owe three duties of care to longshoremen: (1) the turnover duty; (2) the active operations duty; and (3) the duty to intervene.  See id.; see also Howlett v. Birkdale Shipping Co., 512 U.S. 92, 98 (1994).

The turnover duty requires the vessel owner to turn the ship and its equipment over to a stevedore "in such condition that an . . . experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, will be able by the exercise of ordinary care" to manage his stevedoring operations.  Howlett, 512 U.S. at 98 (internal quotation and citation omitted).  There is a corollary duty to warn the stevedore of "any hazards on the ship or with respect to its equipment, so long as the hazards are known to the vessel or should be

known to it in the exercise of reasonable care, and would likely be encountered by the stevedore . . ., are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work." Id.; see also Kirsch v. Plovidba, 971 F.2d 1026, 1029 (3d Cir. 1992). The active operations duty requires that a vessel owner "exercise reasonable care to prevent injuries to longshoremen in areas that remain under the active control of the vessel." Howlett, 512 U.S. at 98. Lastly, a vessel owner with knowledge of a dangerous condition has the duty to intervene and repair the dangerous condition "in areas under the principal control of the independent stevedore." See id.

## II.    Parties' Arguments

Weeks argues generally that: (1) Collick is not a Jones Act seaman and not entitled to recovery under the Jones Act or the general maritime remedies of maintenance, cure, and unseaworthiness; and (2) Collick is not entitled to recovery under Section 905(b) of the LHWCA. (See dkt. 248-22 at 10.)

Collick argues generally that: (1) Collick is a Jones Act seaman because he satisfies both prongs of Chandris; and (2) he is entitled, as a Jones Act seaman, to recovery under Jones Act negligence, maintenance, cure, and unseaworthiness. (See dkt. 262 at 5–21.) Collick argues in the alternative that Weeks should be found liable as a dual capacity employer-owner under Section 905(b) of the LHWCA. (See id. at 21–26.)

### A.      Jones Act <u>Chandris</u> Test: Duties of the Employee

#### 1.      Weeks' Argument

The first prong of the Jones Act <u>Chandris</u> test requires "an employee [to] demonstrate that his or her duties contribute to the function of the vessel or to the accomplishment of its mission." <u>Chandris</u>, 515 U.S. at 148. Weeks does not deny that it was the owner of the barge or barges that Collick boarded at the Earle Project. (<u>See</u> dkt. 261-1 at 4–5.) Weeks argues that the function of each Earle Project crane barge "was to provide crane services to deliver construction materials to the job site." (Dkt. 248-22 at 14; dkt. 261 at 12.) Weeks argues that Collick did not fulfill this mission because he: (1) did not operate the vessel and was not licensed to do so; and (2) sporadically spent time on the barge, engaging in tasks that did not contribute to the function of the vessel, i.e., eating lunch, storing tools, and getting ready for work. (<u>See</u> dkt. 248-22 at 14–15.) Weeks concedes that Collick furthered the mission of the vessel insofar as he assisted in the "handling of lines when tug boat crews moved the barges," but argues that this task was "transitory in nature" and "does not transform plaintiff's status as a dockbuilder into that of a seaman." (<u>See</u> <u>id.</u> at 15 (citation omitted.))

#### 2.      Collick's Argument

Collick asserts that the mission of the barge, as identified by Mowers, was "to build a pier." (<u>See</u> dkt. 252-3 at 143; dkt. 262 at 9.) Collick argues that he fulfilled the mission of the barge because his "entire association with Weeks at Earle was in service of one of Weeks' construction vessels." (<u>See</u> dkt. 262 at 9; <u>see also</u> dkt. 249-3 at 21–22.)

Collick relies upon Grab v. Boh Brothers, Construction, LLC., Co., 506 Fed. App'x 271 (5th Cir. 2013), and asserts that "Boh defeats Weeks' motion."  (See dkt. 262 at 11.)  In Boh, ironworkers were injured while travelling in a workboat from a bridge construction site to the shore.  Boh, 506 Fed. App'x at 273–74.  The ironworkers performed work on both the bridge itself and an accompanying barge.  See id.  Collick notes that the ironworkers in Boh were responsible for the same type of work as Collick: "erecting work platforms around the bridge pilings, setting caps on pilings, setting pads, and setting the bridge girders."  (See dkt. 262 at 11.)  See also Boh, 506 Fed. App'x at 274.  The Fifth Circuit held that the ironworkers satisfied the first prong of Chandris because the barge was a vessel in navigation, and the ironworkers assisted in the accomplishment of the vessel's mission, i.e., building a bridge. See id. at 275.  Collick argues these facts are analogous to the present motion; here, the barge was a vessel in navigation, the mission of the vessel was to build a pier, and Collick fulfilled that mission.  (See dkt. 262 at 12.)

**B.      Jones Act Chandris Test: Connection to a Vessel**

**1.      Weeks' Argument**

Weeks asserts that Collick fails the "duration" portion of the second prong of Chandris because "he spent significantly less than 30 percent of his work time aboard vessels." (Dkt. 248-22 at 16; dkt. 261 at 16–17.)  Weeks notes that during Collick's first six months of employment at the Earle Project, he was engaged in driving piles for the new pier. (See dkt. 248-22 at 17.)  Plaintiff completed further work on the piles, including cutting the piles and installing precast pier caps on the tops of the piles.  (See id. at 18.)  Weeks claims, per Collick's testimony, that all of Collick's work on the piles took place either on the frame,

18

on the piles as they were cut, or on the pile caps as they were installed.  (See id. at 19.) Weeks states that Collick spent the last month of his employment performing miscellaneous tasks on the pier itself.  (See id. at 18–19.)

Weeks also argues that Collick fails the second prong in terms of the nature of his employment because he cannot establish that his duties "(1) regularly took him to sea; (2) were typical sea-faring duties; and (3) exposed him to the perils of the sea."  (Dkt. 248-22 at 23; see also dkt. 261 at 20–21, 24–32.)  Weeks further notes that Collick's reliance on Boh is misplaced because: (1) the ironworkers in Boh spent "at least 30 percent of their workday" aboard the barge; (2) the ironworkers in Boh worked on the barge, whereas photographs of the Earle Project indicate that Collick physically worked on the pier; (3) one of the ironworkers in Boh "was responsible for directing the maintenance, operation and navigation of the barge including positioning and movement of the crane barge, service and maintenance of the crane barge, [and] direction of the crane operator," whereas Collick did not operate the cranes; and (4) one of the ironworkers in Boh was charged with moving the barge daily, whereas Collick's handling of the lines was "minor in nature and . . . does not transform plaintiff's status as a dockbuilder into that of a seaman."  (See dkt. 268 at 5–8, 11–12.)

### 2.    Collick's Arguments

Collick argues that he had a substantial connection to the vessel because he "spent virtually all of his work day on a vessel."  (See dkt. 249-3 at 23.)  Collick asserts that the time sheets, which reflect that he was assigned to a barge from October 9, 2006 until the date of his accident on November 17, 2006, "removes the [seaman] issue from the realm of debate." (See dkt. 249-3 at 17.)  Collick claims that his work upon the barge accounted for "50 to 60

percent of his time," and that the crane operator's testimony supports this estimate. (See dkt. 262 at 20.) Collick further asserts that Mowers' 10 percent estimate should be disregarded because Mowers was the construction superintendent and "it was impossible for him to continuously observe Collick" on such a large job. (See id.)

### C.   Jones Act Negligence

#### 1.   Collick's Arguments

Collick argues that Weeks, in its capacity as vessel owner, was negligent in causing his fall from the precast concrete because Weeks "knowingly violated its own safety rules by allowing Collick to work without fall protection or fall arresting gear when he was exposed to a fall of at least ten feet." (See dkt. 249-3 at 26–27.) Collick asserts that Weeks, along with its safety contractor, "made a corporate decision to disregard the fall protection requirements contained in Weeks' own safety rules, OSHA, and the Army Corps of Engineers Safety Manual." (See id. at 27.) Collick further notes that the accident occurred "under the direct supervision of his foreman and the jobsite superintendent," thus satisfying Collick's "featherweight burden of proving that Weeks was a cause of his accident." (See id.)

#### 2.   Weeks' Arguments

Weeks argues that even if Collick is a Jones Act seaman, there are two genuine issues of material fact that preclude summary judgment on the issue of Jones Act negligence: (1) whether Mowers let Collick work unsafely; and (2) whether ladders were available that would have permitted Collick to safely access the Y-beam rather than stand on it. (See dkt. 261 at 44.)

20

With respect to the first issue, Weeks notes that there is conflicting testimony as to Mowers' role in the accident.  (See id.)  Mowers testified Collick "was working safely from the pre[]cast 'L' for minutes, and that he did not have the opportunity to intervene when, at one point, plaintiff stepped onto the [Y-]beam and fell seconds later."  (Id. (internal quotation omitted.))  Collick testified "at no point in the process of bending the rebar was he ever standing on the pre[]cast 'L.'"  (Id.)  Weeks argues that a reasonable jury could find Collick violated Weeks' rule to not stand on the Y-beam, and that Mowers did not have time to react before Collick fell.  (See id.)

With respect to the second issue, Weeks asserts there is conflicting testimony as to whether ladders were available, which would have permitted Collick to safely fix the rebar.  (See id. at 44–45.)  Mowers testified "ladders were available that plaintiff should have used to access the [Y-]beam."  (See id.; see also dkt. 248-10 at 22; dkt. 248-11 at 3.)  Conversely, Weeks notes that Collick testified ladders were not normally available on the pier.  (See dkt. 261 at 44; see also dkt. 252-5 at 367.)  Weeks argues that a reasonable jury could find that Collick "could have and should have used a ladder to access the Y[-]beam and . . . avoid any fall risk."  (See dkt. 261 at 45.)

### D.     Section 905(b) of the LHWCA

#### 1.     Weeks' Arguments

Weeks argues, as a threshold matter, that Collick is not entitled to recovery under Section 905(b) of the LHWCA because Weeks was not acting in its capacity as a vessel owner at the time of Collick's injury.  (See dkt. 248-22 at 38–39; dkt. 268 at 12.)  Weeks asserts that it was acting in its capacity as Collick's employer because: (1) Collick was

engaged in construction-related duties; (2) "any issues related to the piece of pre[]cast

concrete being set and to the hickey bar did not relate to Weeks' vessel-related duties"; and

(3) the barge at issue was fixed into the seabed, alongside the pier, at the time of the accident.

(See dkt. 248-22 at 39.)

Weeks alternatively argues that even if this Court finds it was acting in the capacity of

vessel owner at the time of Collick's accident, it did not violate any of its Scindia duties.

(See id. at 40; dkt. 268 at 14–17.)  With respect to the turnover duty, Weeks asserts that "any

condition related to the rebar or the precast concrete which prevented it from setting properly

was not a condition of the ship or its gear, but a condition of Weeks' construction material."

(See dkt 248-22 at 40.)  Moreover, Weeks notes that the turnover duty does not apply to

dangers that are known and obvious to the stevedore or its employee; here, Weeks claims

that "plaintiff was fully aware of the danger of walking on the Y[-]beam," and that any lack

of fall protection cannot be considered a latent defect because such a condition "would be

immediately obvious to an expert and experienced stevedore."  (See id. at 41; dkt. 268 at 14–

15 (internal citation and quotation omitted.))

Weeks asserts that it also did not violate the active operations duty because it was not

operating in its capacity as a vessel owner, and thus the active control duty does not apply as

a matter of law.  (See dkt. 248-22 at 41–42.)  Weeks further notes that Collick testified he fell

from one level of the pier (the Y-beam) to another; thus, no part of the accident area was in

the active control of the vessel.  (See dkt. 268 at 15.)

Weeks argues that it also did not violate the intervention duty as a matter of law

because Collick "was not allegedly injured due to a condition of the barge . . ., but was in fact

injured on and due to a condition of the pier under construction." (See id. at 16.) Weeks further notes "any alleged negligence as [that of] plaintiff's dockbuilder foreman for allowing him to stand on the Y[-]beam." (See dkt. 248-22 at 42.) Weeks argues that the foreman was Weeks' employee only for construction purposes, and not in its capacity as vessel owner; thus, Weeks did not violate its Scindia duty to intervene. (See id.)

### 2.    Collick's Arguments

Collick argues in the alternative that he is entitled to recovery from Weeks under Section 905(b) of the LHWCA because Weeks was operating in its capacity as vessel owner at the time of Collick's accident. (See dkt. 262 at 21.) Collick rests his position on the following facts: (1) "no tool for bending rebar was on the vessel;" and (2) "Mowers . . . directed Collick's work at the time of the accident and he was responsible for all vessel activities." (Id. at 25.)

Collick first asserts that Weeks breached its turnover duty because the barge was allegedly not equipped with fall protection. (See id. at 25; see also dkt. 252-5 at 323–24; dkt. 252-8 at 24–26.) Collick also claims that Weeks breached its active operations duty because: (1) Weeks exercised active control over the vessel and cargo operations vis-à-vis Mowers, who testified that he was in control of vessel operations; and (2) Collick was ordered to bend the rebar by Mowers. (See dkt. 262 at 25.) Collick thus concludes that "the order given by Mowers was an act of negligence that came from the vessel operating side of Weeks' activities." (See id.) Collick asserts that Weeks also breached its duty to intervene because Weeks suspended its "6-foot rule" and "allowed workers to work without fall protection."

23

(See id. at 26.)[9]  Collick argues that Weeks had a duty to intervene and provide fall

protection.  (See id.)

### E.       General Maritime Remedies

#### 1.       Weeks' Arguments

Weeks argues that because Collick is not a Jones Act seaman, he cannot recover

under the general maritime remedies of maintenance, cure, and unseaworthiness.  (See dkt.

248-22 at 33–34.)

#### 2.       Collick's Arguments

Collick argues he is entitled to recovery for maintenance, cure, and unseaworthiness

as a Jones Act seaman.  (See id. at 20–21.)

### III.      Analysis

### A.       Jones Act: Seaman Status

The Court must first decide whether Collick is a Jones Act seaman for the purposes of

Jones Act negligence and the general maritime remedies of maintenance, cure, and

unseaworthiness.  To qualify as a seaman under the Jones Act, an employee must satisfy two

requirements: (1) the "employee's duties must contribute to the function of the vessel or to

the accomplishment of its mission;" and (2) the employee "must have a connection to a

vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of

both its duration and its nature."  Chandris, 515 U.S. at 368 (internal quotation omitted).

---

[9] Weeks' Employee Safety Handbook states that: "A fall protection system is required when working six feet or more above ground or other surfaces and you are unable to work from adequate scaffolding. Restraining belts are prohibited.  Full-body harness is required if directed as part of the personal fall arrest system."  (Dkt. 252-30 at 4.)

The parties do not dispute that a barge constitutes a vessel for the purpose of the Jones Act.[10]  With respect to the mission of the vessel, Collick argues that the mission of the barge, per Mowers' testimony, was to build a pier.  (See dkt. 249-3 at 22; dkt. 252-3 at 143.)  Weeks argues that the mission of the barge was "to provide crane services to deliver construction materials to the job site."  (See dkt. 248-22 at 14.)[11]  Weeks' characterization of the barge's mission—to provide crane services to deliver construction materials—relates to the overall mission of building a pier.  The Court determines that a jury could find that the evidence supports Collick's characterization of the barge's mission, i.e. to build a pier.

The next inquiry under the first prong of Chandris is whether Collick's duties contributed to the function of the vessel.  See Chandris, 515 U.S. at 368.  In satisfying this requirement, the employee does not have to aid the vessel in navigation, but rather must "perform the work of the vessel."  See Wilander, 498 U.S. at 353.  Weeks' time sheets, as well as Collick's testimony and the testimony of his coworkers, indicate Collick's duties dealt mainly with construction, and included such tasks as building ramps and beams, and pouring cement for the various parts of the pier.  (See dkt. 248-2 at 7–8; see also dkt. 249-2 at 5; dkt. 252-19; dkt. 252-20; dkt. 252-21.)  The Court likewise determines that a jury could find that Collick's construction duties fall squarely within the function of the vessel, i.e., building Pier 3 at the Earle Project.

---

[10] Although the parties dispute the specific crane barge numbers, at least one barge that Collick was assigned to, Barge 572, was registered with the U.S. Coast Guard as an industrial vessel.  See supra n.4.

[11] Weeks' proposed barge mission is derived from Collick's testimony, wherein he testified that the barge had a crane, or ringer, that was used to lift and move construction materials while building the pier.  (See dkt. 248-6 at 86.)

The second prong of Chandris requires the Court to determine whether Collick had a substantial connection to the barge in both duration and nature. See Chandris, 515 U.S. at 368. The Fleet Seaman Doctrine requires this Court to consider whether Collick was: (1) predominantly assigned to a navigable vessel; (2) occasionally assigned to a non-navigable vessel; or (3) "spen[t] some time on shore." See Reeves, 26 F.3d at 1256. Here, Weeks' time sheets indicate that Collick was assigned to Barge 572 from October 9, 2006 to November 17, 2006. See Background, Sec.III, supra. Barge 572 has been identified as an industrial vessel by the U.S. Coast Guard. See note 4, supra.

Although this may weigh in favor of a finding that Collick was "predominantly assigned to a navigable vessel" under the Fleet Seaman Doctrine, the Court is precluded from making such a finding here because there remains a genuine dispute of material fact on the issue of whether Collick spent enough time on the barge so as to be considered "substantial." See Chandris, 515 U.S. at 368. Collick testified, and the barge's crane operator agreed, that Collick spent at least 50 percent of his time aboard the barge. (See dkt. 252-5 at 181; dkt. 252-8 at 28.) See also Background, Sec.II, supra. At the same time, Weeks presented testimony from Mowers, who stated Collick spent about 10 percent of his time on the barge. See Background, Sec.II, supra. Collick, in his own deposition, stated that he completed most of his tasks on the concrete pier caps, and identified several photographs of Weeks' employees completing these tasks on the pier itself, rather than the barge. (See, e.g., dkt. 248-9, dkt. 248-10, dkt. 248-11, dkt. 248-12, dkt. 248-13, dkt. 248-14.)

Although the Fleet Seaman Doctrine does not adhere to a strict percentage rule like the Fifth Circuit's 30 percent rule upheld in Chandris, the parties' testimony leads the Court

26

to conclude Collick could have spent anywhere from 10 percent to 50 percent of his time aboard the barge.  The Court cannot reconcile the parties' conflicting testimony on this <u>Chandris</u> prong, and cannot conclude on this record as a matter of law that Collick either was or was not a Jones Act seaman.  Accordingly, the Court will deny Weeks' motion and Collick's cross-motion for summary judgment as to Collick's status as a seaman under the Jones Act.[12]

### B.  Jones Act Negligence

The Court finds that there is an issue of material fact as to Collick's status as a Jones Act seaman and therefore cannot find as a matter of law that Collick is entitled to summary judgment on the issue of Jones Act negligence.

### C.  General Maritime Remedies

The Court finds that there is an issue of material fact as to Collick's status as a Jones Act seaman and therefore cannot find as a matter of law that Weeks is entitled to summary judgment on the issue of Collick's recovery under the general maritime remedies of maintenance, cure, and unseaworthiness.

---

[12] Because the Court finds there is an issue of material fact under the second prong of <u>Chandris</u> as it relates to the durational inquiry, the Court need not consider whether the nature of Collick's work was substantially connected to the vessel, or whether under a totality of circumstances, Collick had a substantial connection to the vessel.  <u>See</u> <u>Chandris,</u> 515 U.S. at 370 ("[T]he total circumstances of an individual's employment must be weighed to determine whether he had a sufficient relation to the navigation of vessels and the perils attendant thereon.")

### D.    Section 905(b) of the LHWCA

As a threshold matter, neither party disputes Collick's status under the LHWCA, and both Weeks and Collick have submitted facts to this Court that indicate Collick is at least a statutorily-covered longshoreman or harbor worker under the LHWCA, if not a Jones Act seaman.  (See, e.g., dkt. 261-1 at 6–12; dkt. 262-1 at 3–6 (describing Collick's employment history as marine construction worker, his membership in a dockbuilder union, and listing the maritime construction tasks that he was assigned to at the Earle Project.))

Having found that Collick is a statutorily-covered employee under the LHWCA, the Court next must consider whether Weeks was acting in its capacity as vessel owner, for purposes of Section 905(b) liability.  See Griffith, 521 F.2d at 44; see also Gravatt v. City of New York, 226 F.3d 108, 119 (2d Cir. 2000) ("It is not disputed that an employee of a dual-capacity employer-owner retains his right to sue the vessel for negligence under section 905(b).")[13]

For the same reasons that the Court denies the parties' motions for summary judgment as they relate to the Jones Act, the Court also cannot find that Weeks is entitled to summary judgment under Section 905(b) of the LHWCA because there are genuine disputes of material fact as to whether: (1) Weeks was operating in its capacity as vessel owner; and (2) Weeks acted negligently by breaching one of the Scindia duties owed to Collick.  Collick has put forth evidence from which a reasonable jury could conclude that Weeks was acting

---

[13] A vessel under the LHWCA is defined as "any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment."  Stewart v. Dutra Constr. Co., 543 U.S. 481, 497 (2005).  The parties do not dispute that the barge involved in this action was a vessel for the purposes of the LHWCA.

in its capacity as vessel owner, and that Weeks may have breached one of its <u>Scindia</u> duties owed to Collick.  Collick's primary claim is that Weeks, as a vessel owner, breached its turnover duty by delivering a vessel, the barge, without fall protection.  (<u>See</u> dkt. 262 at 25.)  Collick cites Weeks' Employee Safety Handbook, which requires fall protection when employees work six feet or more above ground.  (<u>See</u> dkt. 267 at 15–16.)  Collick also points to industry code, as well as regulations from the Occupational Safety and Health Administration, which similarly require fall protection when a person is working at an elevation greater than six feet.  (<u>See id.</u>)  Collick also provides testimony from himself and Mowers, which indicates that the "six-foot rule" was suspended by Weeks on the day of Collick's accident.  (<u>See</u> dkt. 262 at 26; dkt. 252-30 at 4.)  Collick has thus presented a genuine dispute of material fact as to whether Weeks, as a vessel owner, acted negligently in not providing fall protection on its barge, or by suspending the "six-foot rule," such that Weeks could be liable to Collick under Section 905(b) of the LHWCA.  For these reasons, the Court will deny Weeks' motion for summary judgment as to Collick's Section 905(b) claim.

## CONCLUSION

For the reasons stated above, the Court will deny Weeks' motion and Collick's cross-motion for summary judgment.  The Court will issue an appropriate order.

   s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

**Dated:**      July 22, 2016

29